The People of the State of New York, Respondent, *v.*
Carl Loose, Appellant.

(Argued May 9, 1910; decided June 7, 1910.)

Appeal from a judgment of the Court of General Sessions of the Peace in the county of New York rendered February 19, 1910, upon a verdict convicting the defendant of the crime of murder in the first degree.

*Stephen S. Blake* and *Clark L. Jordan* for appellant.

*Charles S. Whitman, District Attorney* (*Robert C. Taylor* of counsel), for respondent.

Haight, J. On the morning of the 24th day of November, 1908, at about 6:30 o'clock, the defendant entered the dining room of the apartment in house No. 1710 Second avenue, city of New York, theretofore occupied by himself and family, while his wife, two sons and daughter Meta were seated at the table eating their breakfast. After entering the room his wife asked him if he would have a cup of coffee and he answered, "Yes." Thereupon he instantly drew a revolver and fired it at his son Frederick, the bullet penetrating his breast, causing a serious wound, and then he fired a second shot, which passed through the heart of his daughter Meta, causing her death a few seconds thereafter. He was then seized by his son John, who, together with his son Frederick, held him until assistance arrived and he was disarmed and placed under arrest. The defendant's family consisted of his wife, his son Frederick Loose, who was a Lutheran

minister; his son John Loose, who was a student for the ministry; his daughter Maria, who was twenty years of age, and his daughter Meta, who was seventeen years old. They had resided in this apartment over six years. His son Frederick had located in South Dakota and had been absent for a year or more. The defendant was born in Germany, was fifty-eight years old, and removed to this country some twenty years before. He was a baker and appears to have supported his family in comfortable circumstances. He was a Lutheran and a regular attendant of that church and had contributed a portion of his income to the education of his sons for the ministry. So far as appears the family had lived happily together until the month of August preceding the homicide, at which time it was discovered that his daughter Maria was pregnant and that for upwards of four years he had had incestuous relations with her. This appears to have caused serious trouble in the family, and in consequence thereof he had written to his son Frederick two letters; but it does not appear that he disclosed the true nature or cause thereof. On receipt of these letters Frederick returned home, and after such return it appears that both his sisters Maria and Meta each informed him that their father had had incestuous relations with them. On Monday morning, the 23rd of November, Frederick, under pretense of obtaining an order from the court to compel one Rooney to support Maria, whom she had married on the 23rd day of October before, induced the defendant to go to the Harlem police court, and after arriving there they entered the private room of Magistrate Crane where he informed his father in the presence of the magistrate that he was charged with having had incestuous relations with his daughters Maria and Meta, and thereupon the magistrate is said to have told him that he had got to leave the country or go to state's prison for life. The defendant replied, addressing his son, to the effect that he thought that they were here to see about Maria's support, and that then the son answered that he was here to answer for what he had done to Maria and Meta. The defendant then denied that he had done anything to the girls, but his son answered to the effect that they had told him that he had.

The son then told him that he had talked with his pastor with reference to the matter and that he had advised that it was best to send him to Panama, and that he must choose which he preferred, to go to Panama or to prison for life. The defendant then asked his son if that was the thanks for the love that he had always given him and begged him not to send him to Panama for he was old and could not go to Panama; that he had heard that the people died there from fever, and if he would wait until he could get a chance he would go to Germany instead, but that he hadn't the money now to go with and wanted time in which to earn the money before he was sent away. The son then told him that if he would get out of the house and never come back he would give him a chance, but that he must ask the magistrate for a detective to look after him. They subsequently left the magistrate's office, who had turned the father over to the care of the son, with directions to produce him in the afternoon of the next day in case he had not gone away, and they walked down Lexington avenue and arranged that the defendant should look up a place to stay and that the son should have his things packed in a trunk and sent to him when an express messenger called for it.

The defendant tells us that he looked for a room but did not find any and that during the afternoon he again went to his home to have another talk with his family. On his arriving home his son Frederick then told him to tell the truth as to whether he had done what has been stated to the girls and again he denied it. His son then told Maria to kneel down on the floor and to swear to God as to whether he had or not. She did so and swore that her father had committed the act. Then Frederick told him that he did not want him any more and that he must go and that if he came back again he would be arrested. The defendant then tells us that he went away. He procured another man to take his place at the bakery during the night, instructed him as to the manner in which the work should be done, went and redeemed his pistol from the pawnshop and that night stayed at a hotel and the next morning went to his house where the shooting already described took place. He, however, states that, owing to his

troubles, he had not slept for many hours and that in the morning he intended to commit suicide and went to the apartments of his family for that purpose, but when he arrived there his condition of mind was such that he could not recollect what he did. He conceded in his testimony that what Maria said was true, that he had had illicit intercourse with her for upwards of four years but still denied that he had had such relations with his daughter Meta, and that he had intentionally shot her. The witness Herbert, however, testified that after the defendant was arrested and while he was going to the station house he asked him why he shot his daughter and he answered, "She accused me of doing wrong to her and that is why I shot her."

It also appears from the testimony of Maria that her father was very angry at her for revealing her condition and accusing him and threatened her, saying, "You will find out what a traitor gets." And when Maria came into the room after the shooting he said to her that he wished he had killed her. It also appears that the defendant became very angry at his son Frederick. He was his favorite son. He had assisted in his education for the ministry and had written him in South Dakota with reference to his troubles. Apparently he supposed that his son would forgive his misconduct and restore peace in his family, but when his son turned against him and forced him to leave his home and family he became very angry and held him responsible for the misfortunes that had fallen upon him. Sometime afterward, while the defendant was still in jail awaiting trial, he wrote a letter to his son, addressing him as "My once beloved son," in which he thanked the Almighty that he had not become his murderer and was glad that he was again well and able to follow his calling; but, after calling his attention to the labor of his life to support his family and to educate him and his brother, he denounced him as being the cause of the misfortunes that had befallen him and his family, and says: "Alas, poor son, it will be very hard for you to make amends for your share of the sin which is the consequence of your rash intervention. With what right, and I ask it before God, who is, I hope, my merciful judge, did you show me from my own home, which I builded and for

which I paid? * * * As I stepped into my home to receive from my own hands the punishment for my misdeed, suffering and depressed, looking for loving children and wife, to die in their midst, then you again roughly show me out, so that wrath took possession of me and force the decision to take you, unfortunate one, along with me." Thus again he acknowledges his anger and the determination that in taking his own life he would take his son's along with him. Again he proceeds in his letter, saying, "Judge not that you be not judged. This I expected in the first place from my own. The world need not have known about this intimate family affair, which, in consequence of your unchildlike behavior and procedure, has brought shame upon you all. He who thus counseled you toward your action could be no friend, no christian, no true man. * * * Confidence in men is the key to their hearts. Long ago I had wished to have striven to be freed from this misery; had you but offered me your saving hand quietly, under four eyes, talked the matter over with me, it would have been better for your poor mother, for me, and for you all. Since it is this way, you should tell the truth and stand by me, that at least I might stand acquitted of the charge that I have murdered my own child."

It is undoubtedly true that the defendant, at the time of the homicide, was acting under great excitement and distress of mind, owing to his sin, his exposure by his daughters and his banishment from home by his son. It is not claimed that he was otherwise mentally diseased. He had always borne a good character, was industrious and temperate, but his sin caused his downfall. His exposure by his daughters and the action of his son in driving him from his home enraged him and furnished the motive for his acts, and it is clear that these acts became the subject of his thoughts during the afternoon and night that preceded the homicide. The evidence tends to show that he intended to kill his daughter. But if there should be a doubt with reference to such intent, it would not affect the result, for if he in an attempt to shoot his son unintentionally killed his daughter, he would be equally guilty of the crime of which he stands convicted.

The facts presented are such that we are unable to escape the conviction that the case was one for the disposition of the jury and that the evidence with reference to his mental condition, as well as that of deliberation and premeditation, was ample to sustain the verdict rendered.

The defendant's counsel bitterly complains of the remarks made by the district attorney in his opening of the case. Among other things he stated, in substance, that the defendant's illicit intercourse with his daughter Maria continued from the time when she was but ten years of age, and that when it was discovered that she was pregnant he took her to some one to have an operation performed on her, and that he also conspired with her to lay her trouble to one Rooney and compel him to marry her. At the conclusion of the remarks of the district attorney the defendant's counsel called the attention of the court thereto, and asked the judge to instruct the jury that they should disregard the statement so made. The court thereupon did instruct the jury that they should give no heed whatever to any statement made by the district attorney as evidence; that facts proved in evidence were only to be regarded by them. Upon the trial the district attorney offered evidence to establish the statements which he had made, but the evidence was excluded by the court on the objection of the defendant's counsel. The trial judge did all that the defendant's counsel asked him to do, and no complaint is now made with reference to his action in the matter. He was the officer presiding at the trial who became responsible for its conduct, and it is his errors, if any, that are brought up for review, and not those of the district attorney who may have asked incompetent questions or sought to introduce improper evidence. Subsequently, during the trial, some evidence with reference to the relation existing between the defendant and his daughters was properly disclosed, in the attempt of the district attorney to establish motive and to prove threats. We, therefore, upon this branch of the case, find no error committed on the part of the trial judge. The charge to the jury by the trial judge appears to have been satisfactory to the defendant, for no exception was taken to any part thereof. We have carefully examined the excep-

tions that were taken to the admissions and rejections of evidence but have found no errors in the rulings of the court that would justify a reversal.

The judgment and conviction should be affirmed.

CULLEN, Ch. J., WERNER, WILLARD BARTLETT, HISCOCK and CHASE, JJ., concur.

Judgment of conviction affirmed.