## SUPREME COURT — APPELLATE DIVISION — FIRST DEPARTMENT.

### May 17, 1918.

## THE PEOPLE v. WILLIAM C. HAMILTON.

(183 App. Div. 55.)

COERCION—PENAL LAW, § 530—ARREST AND DETENTION OF SAILOR BY PROPRIETOR OF DETECTIVE AGENCY FOR SOLE PURPOSE OF OBTAINING REWARD.

The principal of a detective agency, conducting the same and holding the license therefor, may be convicted of coercion in violation of section 530 of the Penal Law, where it appears that his representative, with a view to preventing a sailor from reporting, undertook to arrest him and brought him handcuffed to defendant's office and prevented his going on board to report until after sufficient time had expired to make him a deserter, for the sole purpose of collecting the reward, and that he in person and through his agents refused the sailor's request to be taken to the navy yard, and detained him in his office, part of the time in handcuffs.

SAME—AUTHORITY TO MAKE ARREST.

The detective agency operated by the defendant had no authority to make such arrest.

SAME—SUFFICIENCY OF INFORMATION.

The information charging the defendant with coercion was not demurrable upon the ground that he was not accused before the magistrate with the specific crime, as all the facts essential thereto were before the magistrate and examined by him.

APPEAL by the defendant, William C. Hamilton, from a judgment of the Court of Special Sessions, City of New York, Borough of Manhattan, Part VI, rendered against him on the 21st day of January, 1918, convicting him of a violation of section 530 of the Penal Law, and also from the judgment of said court overruling the demurrer and denying his motion to dismiss the information for lack of jurisdiction and further denying his motion for a new trial.

*George Gordon Battle,* of counsel (*Almuth C. Vandiver,* with him on the brief; *O'Gorman, Battle & Vandiver,* attorneys), for the appellant.

*Robert S. Johnstone,* of counsel (*Albert Blogg Unger,* with him on the brief; *Edward Swann, District Attorney*), for the respondent.

DOWLING, J.:

The defendant is the principal of the Hamilton Detective Agency, conducting the same and holding the license therefor. Its place of business is on the ninth floor of an office building at Forty-third street and Broadway, in the borough of Manhattan, city of New York. It leases and occupies three rooms known as 906, 907 and 908. On the door of room 906 was an American flag, with the words beneath, " Office of Captain H. A. Reed," and " Entrance, Room 907." The door to room 907 bore no inscription. On the door of room 908 appeared the words, " Hamilton Detective Agency — William C. Hamilton Principal; James A. Hamilton Superintendent; Hamilton Patrol Company; Notary; Entrance." The doors from these different offices led into the offices of the Hamilton Detective Agency. Part of the activities of the agency was composed of what is known as the " deserter business," engaged in by men named Harry Reed and James Eaton, and who, according to defendant's testimony, had an arrangement with him by which he financed their operations, and all checks received for rewards for stragglers or deserters from the United States Navy, whether payable to defendant's agency or to Reed, were indorsed by defendant and deposited in his bank account. The reward offered for a deserter was fifty dollars, out of which Reed and Eaton got fifteen dollars each and defendant got the remaining twenty dollars, from which he paid some expenses. He claims that he charged Reed and Eaton rent for their use of room 906 to the extent of ten dollars per month out of fifty

dollars paid by him therefor. Defendant had been a patrolman on the New York City police force for two years and four months. Reed had been in the business of apprehending stragglers and deserters for sixteen years, and his connection with defendant had lasted for about two years. Two employees named Bain and Fields worked from time to time for either defendant or Reed. The defendant kept books of his business and entries were made from slips turned in by Reed and Eaton showing the details of each transaction affecting a deserter or straggler. It appears from the testimony of defendant's witness Captain A. C. Hodgson, commanding officer of the receiving ship at the Brooklyn Navy Yard, that defendant's agency was authorized by him to arrest every deserter for whom he sent them notice of a reward of fifty dollars and of whom a description was furnished. He also says that he told Reed or Eaton that if a man had been twenty-four hours over liberty he was a straggler, and for each straggler brought to the ship he would pay a reward of twenty-five dollars. Hodgson's dealing with defendant's agency was because he understood it had been engaged by the commanding officers of ships and by the Bureau of Navigation. It appears by his testimony that a sailor in the United States Navy who overstayed his shore leave and did not return to his ship at the appointed time was " over leave " and was not classed as a straggler until a reward was offered. This reward was twenty-five dollars, and in the notice thereof the alleged straggler was not only specifically named but described with particularity. Upon the expiration of ten days from the end of his shore leave, the sailor becomes a deserter and the reward for his return in that event is fifty dollars if he has been announced by name and the reward offered. But he testified that the Bureau of Navigation can authorize the payment of this reward if a deserter is legally arrested, even if no reward has been preliminarily offered. A sailor can also be declared to be a deserter by the captain of his ship, before ten

days have expired, if conditions indicate that he has left the vessel on leave but with no intention of returning. Captain Hodgson testified positively that the sailor (whether straggler or deserter) is to be turned over as soon as he is arrested, and that no detective agency was authorized to keep either deserters or stragglers over night.

Ray E. Davidson, eighteen years of age, a sailor on the *Maine,* was given leave of absence on July 26, 1917, expiring on the next morning, the twenty-seventh. He claims that with another sailor and two companions, whom he met after he left his ship, he came to New York, and after going to a restaurant he remembered no more (claiming to have been drugged) until he found himself in Yonkers eight days later, just before noon of August 4th. He then made his way to the foot of West Ninety-sixth street, where he asked the captain of a destroyer tied up at the dock what he was to do and (the *Maine* having sailed on July 29th) was advised by him to report on board the *Montana,* then lying in the North river. The next morning he came again to the foot of West Ninety-sixth street, waiting for a boat to carry him to the *Montana* to report himself, and was sitting awaiting the boat when Eaton came up and asked him his name and where he was going. The court excluded testimony as to what Eaton said, but Davidson testified that Eaton took him in handcuffs to the building where defendant's business was conducted. They arrived there about 10 o'clock of the morning of August 5th, and Eaton took him at once to room 906, one of the rooms leased and occupied by the defendant's agency, in which the "deserter business" was specially conducted. Here Davidson was allowed to wash and in a little while defendant came into the room. He was addressed by Reed as "Captain" Hamilton, but though he told Davidson he was a captain in the army, no effort is made to show he had any right to such a title, and Reed was known as "Captain" Reed, though how he acquired the title does not appear. These

titles, as well as the American flag upon the door of room 906, were intended to impress the victims of the institution with the idea that it was an official or governmental agency. Defendant asked Davidson what his name was and what ship he was off, and then left. At this time Davidson was a straggler, for whom no reward had been offered. His ship had sailed two days after his shore leave expired, and his captain is not shown to have offered any reward or sent out any notice for him. He had overstayed his leave nine days, and if he had been returned at once to the receiving ship at the Brooklyn Navy Yard, which was the duty of those arresting or detaining him, he would not have been a deserter, for the testimony is that no person or agency had the right to hold him over night, and his ten days' overstay of leave would not have expired until the next morning (August 6th). But defendant's "deserter business" was not conducted to help sailors or the government, but to collect rewards. So for nine days Davidson was kept a prisoner in room 906, at times shackled to the radiator therein, sleeping and having some of his meals there, though he had some meals elsewhere with Reed or one of the operators. During that time he saw defendant every day, saw him talking to Reed and Eaton, and heard them discussing about "getting" other men. Davidson asked Reed and Eaton to let him go to the Navy Yard and to take him back there. He swears that defendant asked him if he was tired waiting and Davidson told defendant to take him to the Navy Yard and he said he could not do it. Davidson said that defendant saw him with handcuffs on several days after his first arrival at the office; he also testified that defendant said he (Davidson) would have to stay there until they received word from Washington about him. Meantime false and misleading telegrams were being sent to Washington, in the effort to have the payment of the deserters' reward of fifty dollars authorized to be paid by the Bureau of Navigation for Davidson's surrender.

The first was as follows:

"*August* 6, 1917.

" CHIEF BUREAU OF NAVIGATION,

    " Washington, D. C.

" In custody identified admits desertion Ray Edward David-son deserted the *Maine* July 25, 1917.

                 " HAMILTON'S DETECTIVE AGENCY,

                       " 1482 Broadway, N. Y. City."

It is to be noted, *first,* that this telegram was not sent until the day after Davidson had been taken into custody by Eaton, and when Davidson had already been improperly kept in custody over night; *second,* that it was not sent until after the ten days' overstay leave had expired, so as to be sure that Davidson was actually a deserter, though made so by his detention; *third,* that it was falsely said that Davidson admitted desertion; *fourth,* that it falsely represented that he deserted the *Maine* on July 25th, thus making his period of absence over leave on August 6th twelve days, and putting his status as deserter beyond question. All this was evidently done to induce the Bureau of Navigation to direct the payment of the reward for a deserter. A similar telegram was sent regarding Herbert Hallett, who was said to have admitted desertion from the *Maine* and to have deserted July 27th, though he was arrested on August 7th when he had overstayed his leave only seven days. But the Bureau of Navigation did not reply, so the following night letter was sent by wire, the date of which does not appear:

" CHIEF BUREAU OF NAVIGATION,

    " Washington, D. C.

" In custody identified admits desertion Raymond Edwin Davidson deserted *Maine,* July 25, 1917. This is the third telegram we have sent the Bureau requesting the status of this man. Please wire instructions.

              " HAMILTON'S DETECTIVE AGENCY,

                  " 1482 Broadway, N. Y."

It will be seen that the false date of the desertion is repeated in this telegram.

Then on August 10th, marked " rush," the final telegram was sent:

" CHIEF BUREAU OF NAVIGATION,
  " Washington, D. C.

" Ray Edwin Davidson and Herbert Arnold Hallett deserted *Maine* last month. Still in custody. . Please wire instructions.
      " HAMILTON'S DETECTIVE AGENCY,
        " 1482 Broadway, N. Y. C."

These telegrams were offered in evidence by defendant in the effort to show that Davidson was being held to await orders from Washington. What they really establish is, that the sole solicitude of the agency was to make it appear that Davidson was a self-confessed deserter, so as to induce the government to offer the reward of fifty dollars, which was all that the defend-ant and his associates were interested in. Finally, on August 14, 1917, at 5:30 P. M., according to the record made in defend-ant's books in his own admitted handwriting, Davidson was delivered by Eaton aboard the receiving ship *Havana* at the Brooklyn Navy Yard, and the fifty dollars reward was paid August 22d. The entry in his book, made by defendant person-ally, repeated the false statement that Davidson had deserted from the *Maine* on July 25th, showed that he was " appre-hended " by Eaton at 10:35 A. M. on August 5th and was brought to the office and " held awaiting telegram from Bureau." The entry was signed under the receipt of payment " Hamilton Detective Agency per (blank)," a rubber stamp being used, but defendant admitted he made the entry personally. The entry was headed (a rubber stamp being used) "Aug. 5, '17," but defendant claimed the entry was not made by him until August 14th, when he received the slip from Eaton. He denied ever having seen Davidson until he saw him in the Magistrate's

Court on August 28th; denied ever seeing him handcuffed; denied ever having any conversation with him, and denied knowing that he was in his office at all. On the other hand, defendant's bookkeeper admitted seeing Davidson as well as several other boys in the defendant's office. Herbert A. Hallett, likewise a sailor on the *Maine,* was apprehended by Eaton, also at Ninety-sixth street, on August 7th, when he had overstayed his leave seven days. He was taken to defendant's office and saw Davidson there. He swears he saw Davidson handcuffed several nights, on one of which nights defendant passed through the room into his office at about 8 o'clock. He saw defendant present in the office on several occasions while Davidson was being detained and heard defendant ask Davidson if he was tired waiting; the latter replied that he was, whereupon defendant said, " we will have to wait until we hear from the bureau." In defendant's ledger, under the heading "Army and Navy," appears the entry, "August 5, Raymond E. Davidson, 48 Navy," with entries two dollars, thirty-three dollars and fifty dollars, indicating respectively " expense," " salary " and " services charged." The thirty-three dollars, according to defendant, represented fifteen dollars paid to Reed, fifteen dollars paid to Eaton, and three dollars for whatever expenses were charged. When the police officers called at defendant's office before his arrest, he refused to allow the officers to go through his rooms to see if sailors were being held against their will, saying that he was a former policeman and " knew the ropes." Reed then introduced himself as " manager of this detective agency, of the desertion bureau." Defendant was finally arrested in the district attorney's office. Davidson has been convicted by a court martial of desertion and sentenced to two years' imprisonment.

The defendant has been convicted of a violation of section 530 of the Penal Law, by which " coercing another person " is made a misdemeanor. The section reads as follows:            -

"A person who with a view to compel another person to do or to abstain from doing an act which such other person has a legal right to do or to abstain from doing, wrongfully and unlawfully,

" 1. Uses violence or inflicts injury upon such other person or his family, or a member thereof, or upon his property or threatens such violence or injury; or,

" 2. Deprives any such person of any tool, implement or clothing or hinders him in the use thereof; or,

" 3. Uses or attempts the intimidation of such person by threats or force,

" Is guilty of a misdemeanor."

It is objected at the outset that this section was enacted in 1882 as section 653 of the Penal Code (Laws of 1881, chap. 676, § 653, as amd. by Laws of 1882, chap. 384) for the obvious purpose of dealing with labor problems and to supply certain omissions in other labor legislation, and that it was not intended to be applied to any other situation. It may be quite true that the particular state of facts disclosed by this record was not contemplated by the framers of the section, and yet that is no valid objection to a conviction being had thereunder, if the proven facts bring the offense within the letter of the statute. (United States v. Mosley, 238 U. S. 383; Louisville & Nashville Railroad Company v. Layton, 243 U. S. 617.) As was said by Judge WERNER in People v. Abeel (182 N. Y. 415): " We are living in an age when the wisdom of Legislatures and the learning of courts are put to the severest tests by the cunning and skill of the unscrupulous adventurer and the professional criminal. Statutes are rarely the precursors of crime. They usually follow in their wake. Our centers of population are infested with persons whose highest aim in life seems to be the circumvention of the criminal law by the invention of new crimes. * * * It may be equally true that the same act might be punished with even greater effectiveness under a different name, but it is not the province of courts to legislate or

to nullify statutes by over-strict construction. This is particularly true when the Legislature has ordained a rule of construction. Section 11 of the Penal Code provides that ' the rule that a penal statute is to be strictly construed does not apply to this Code or any of the provisions thereof, but all such provisions must be construed according to the fair import of their terms, to promote justice and effect the objects of the law.' Tested by that simple rule, we think the indictment herein charges a crime which was established by ample evidence." (The section quoted is now section 21 of the Penal Law.)

Applying this reasoning to the case before us, while defendant could have properly been convicted of other and more serious crimes because of his actions, we think that he was properly convicted of the misdemeanor of coercion and is subject to the penalties therefor. The evidence established defendant's responsibility for the maintenance in his own office of what he called the " deserter business; " his knowledge of and participation therein; his " financing " (as he calls it) of its expenses; his personal entering in his record book of its details; his maintenance of an account of its receipts and expenses in his ledger, kept by his bookkeeper; his handling of the rewards, even extending to the endorsement of Reed's name upon the checks made out to the order of the latter; his familiarity with the course and progress of the enterprise; his continual visits to the room in which the sailors were confined; his interrogation of the prisoners, and his active, full and profitable participation in all the doings of this peculiar " business." The defendant, Reed and Eaton were engaged in a common enterprise of making money out of this " deserter business," and whether Reed and Eaton are regarded as defendant's agents, employees, partners, representatives or coadventurers, his responsibility for their acts in the ordinary conduct of that business is the same. As I view it, the statute was violated (a) when Eaton, defendant's representative, agent or partner,

unlawfully arrested Davidson and prevented his going on board the *Montana* to report; (b) when defendant in person and through his agents, partners or representatives, refused Davidson's request to be taken to the Brooklyn Navy Yard, and detained him in defendant's office, part of the time in handcuffs. As to the first proposition, Davidson had a legal right to go to the *Montana* to report himself, particularly as his so doing would have absolved himself from the charge of desertion, the ten days not having yet expired. Eaton, with a view to preventing Davidson from doing so, undertook to arrest him, and brought him, handcuffed (constituting violence), to defendant's office. The continued confinement of Davidson in defendant's office, to the latter's knowledge and with his consent, constituted a crime also, but not the one of which defendant has been convicted. But when Davidson, to defendant's knowledge a prisoner in his office and after the latter had repeatedly seen Davidson thus confined, asked to be taken back to the Brooklyn Navy Yard, where he should have been returned in any event not later than the night of his alleged arrest, and defendant refused to allow Davidson to be taken there or to take him there himself, defendant personally was guilty of a violation of this section, for by his act and by the violent detention of Davidson, he was compelling the latter to abstain from returning to the Brooklyn Navy Yard, as he had a legal right to do.

Defendant attempts to justify the arrest of Davidson upon the ground that the Hamilton Detective Agency had the authority to make such arrests. Defendant claims that the statute confers such rights upon a proper officer, and that as well the power was conferred upon the Navy Department by statute, and that " by reason of the inherent powers of the executive," such power could be delegated to the defendant. In Kurtz v. Moffitt (115 U. S. 487) it was held that a police officer of a State, or a private citizen, has no authority as such, without

any warrant or military order, to arrest or detain a deserter from the army of the United States. Mr. Justice GRAY in his opinion said that if a police officer or a private citizen has the right, without warrant or express authority, to arrest a military deserter, the right must be derived either from some rule of the law of England, which has become a part of our law, or from the legislation of Congress. Starting with the proposition that, by the common law of England, neither a civil officer nor a private citizen had the right without a warrant to make an arrest for a crime not committed in his presence, except in a case of a felony, and then only for the purpose of bringing the offender before a civil magistrate, he traced the history of the law of England and reached the conclusion that (p. 500): "It does not appear to have ever been the law of England that a peace officer or a private citizen could as such, and without any warrant or order either from a civil magistrate or from a military officer, lawfully arrest a deserter for the purpose of delivering him to the military authorities for trial by court martial." After a careful review of the legislation in the United States, he reached the further conclusion (p. 505): "Upon full consideration of the question, and examination of the statutes, army regulations and other authorities, cited in the elaborate argument for the respondents, or otherwise known to us, we are of opinion that by the existing law a peace officer or a private citizen has no authority as such, and without the order or direction of a military officer, to arrest or detain a deserter from the Army of the United States. Whether it is expedient for the public welfare and the good of the Army that such an authority should be conferred is a matter for the determination of Congress."

On October 1, 1890, Congress enacted (26 U. S. Stat. at Large, 648, chap. 1259, § 2; re-enacted 30 id. 484, chap. 469, § 6): "That it shall be lawful for any civil officer having authority under the laws of the United States or of any State,

Territory, or District, to arrest offenders, to summarily arrest a deserter from the military service of the United States and deliver him into the custody of the military authority of the General Government." But this provision of law did not apply to Eaton or Reed or defendant, because not one of them was a civil officer. In the absence of statutory authority, defendant is forced to fall back upon the claim that he or his representative was authorized by the Navy Department or the Bureau of Navigation to make the arrest. But the evidence established that defendant had no general power conferred upon him or his associates to make arrests. On the contrary, when the arrest of a straggler or a deserter was desired, a notice was issued by the captain in charge of the receiving ship, describing the deserter with great particularity. A sample notice for a straggler is part of the case. It concludes with the warning, identity of the straggler or deserter." This notification from the captain of the receiving ship was in effect a warrant. It refers throughout to a " civil officer " as the person who is to make the arrest. Admittedly, defendant was not such. No one could claim even apparent authority to make an arrest until such a notice was issued, describing the individual to be arrested. Defendant makes many references to the regulations for the government of the navy (not offered in evidence), but not one of them by any possible interpretation excused defendant's acts or conferred any authority upon him or his associates to make an arrest. Nor is he protected by any supposed authorization to arrest and turn in a straggler, for Davidson was not surrendered by defendant or his agents as a straggler.

Defendant also contends that his demurrer to the information should have been sustained, upon various grounds, none of which we deem to be tenable. Among other things, he claims that because he was not charged before the magistrate with the specific crime of coercion, the information charging

him with that crime was demurrable. But all the facts essential to the charge of coercion were before the committing magistrate and examined into preliminarily by him, and the complaining witness' affidavit covered the period and the acts embraced in the scope of the information herein. " When such an investigation has been had and the papers are submitted as required by the statute to the district attorney, he is empowered to file an information against the defendant for any offense disclosed in those papers which has been the subject of investigation." (People v. Spier, 120 App. Div. 786. See, also, Matter of Paul, 94 N. Y. 503; St. Lawrence County v. Goldberg, 175 App. Div. 88.)

This record discloses a sordid and brutal course of conduct upon the part of defendant and his associates, whereby they traded upon the weakness or misfortune of sailors who had overstayed their leave and sought to make them a source of revenue. Defendant had no idea of helping the government by the operations of his " deserter business," but solely of securing the rewards offered for the return of stragglers or deserters from the navy. In order to make his operations as profitable as possible, the arrests were made at a point where sailors would naturally go in order to return to their ships. As in the case of Davidson, the sailor's willingness to go on board a vessel and face his punishment as a straggler was seized upon as an opportunity to arrest him, convey him in irons to defendant's office, and there, handcuffed or shackled to a radiator, treated more like an animal in confinement than a human being, keep him a prisoner until his offense of straggling became the greater one of desertion, and then by false telegrams it was sought to obtain from the Bureau of Navigation the authorization of payment of a reward. Davidson was kept unlawfully for nine days in defendant's office, at an expense to defendant of three dollars, until the reward was made sure. The result of defendant's scheme was, that he and his agents

and associates, Reed and Eaton, have shared fifty dollars between them, and Davidson has been sentenced to two years' imprisonment. It is fortunate for the defendant that he was not indicted for the more serious offense which the record discloses.

The judgment of conviction should be affirmed.

CLARKE, P. J., LAUGHLIN, PAGE and SHEARN, JJ., concurred.

Judgment affirmed.